**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 22-cr-00202-RM-2

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.      DHRUV JANI,

      Defendant.

---

**PLEA AGREEMENT**

---

The United States of America (the government), by and through Martha A. Paluch, Assistant United States Attorney for the District of Colorado, and the defendant, DHRUV JANI, personally and by counsel, Stephanie M. Snyder, Esq., submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

## I.    AGREEMENT

**A.    Defendant's Plea of Guilty:**

The defendant agrees to:

(1)    plead guilty to Count 1 of the Superseding Indictment charging a violation of Title 18, United States Code, Section 1956(h) and 1956(a)(1)(B)(i), Money Laundering Conspiracy (Concealment);

(2)    waive certain appellate and collateral attack rights, as explained in detail below;

(3)    agree to the entry of a stipulated judicial removal order, as explained in detail below;

Court Exhibit

1

(4)   be liable for restitution to the victims.  In advance of the sentencing hearing, the government will provide the exact amount due to each victim to the Court and probation. The defendant reserves the right to challenge this amount. Any amount of restitution ordered by the Court should be ordered joint and several with both of defendant's co-conspirators convicted in this case; and

(5)    agree not to contest forfeiture as more fully described below.

## B.   Government's Obligations:

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A).  The government will move to dismiss Counts 2-7 of the Superseding Indictment with prejudice, against this defendant only, by oral motion at the time of sentencing.[1] Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement and potentially file a second superseding indictment.

Provided the defendant does not engage in prohibited conduct or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b).

The government agrees to recommend a sentence of 121 months in prison.  The defendant understands that this agreement is not binding on the Court.   The defendant is free to file a motion for departure and/or for a variance and the government states that it will oppose any such motion.

---

[1] Dismissal of Count 7, Interstate Transmission of a Threatening Communication, is contingent upon the Court signing the Order of Judicial Removal.  Should the Court elect not to sign this Order, the parties will request to be released from the plea agreement.

## C.    Defendant's Waiver of Appeal

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

    (1)    the sentence exceeds the maximum sentence provided in the statute of conviction, 18 U.S.C. § 1956(h), 1956(a)(1)(B)(i);

    (2)    the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at the offense level ultimately determined by the Court to apply; or

    (3)    the government appeals the sentence imposed.

If the first criteria applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence. But if one of the latter two criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

    (1)    the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2)     the defendant was deprived of the effective assistance of counsel; or

(3)     the defendant was prejudiced by prosecutorial misconduct.

The defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings.  In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

## D.     Defendant's Voluntary Waiver of Rights

The defendant agrees to the entry of a stipulated judicial order of removal pursuant to Title 8, United States Code, Sections 1228(c)(5) and Section 1182(a)(2)(I)(i/ii).  Specifically, the defendant admits that he is a native and citizen of India, he currently has no status in this country, and that he is removable from the United States as an alien (i) who a consular officer or the Attorney General knows, or has reason to believe, has engaged, is engaging, or seeks to enter the United States to engage, in an offense which is described in section 1956 of title 18 (relating to

laundering of monetary instruments); or (ii) who a consular officer or the Attorney General knows is, or has been, a knowing aider, abettor, assister, conspirator, or colluder with others in an offense which is described in such section.

After consultation with counsel and understanding the legal consequences of doing so, the defendant knowingly and voluntarily waives the right to the notice and hearing provided for in Title 8, United States Code, Section 1228(c)(2), and further waives any and all rights to appeal, reopen, reconsider, or otherwise challenge this stipulated removal order. The defendant understands and knowingly waives his right to a hearing before an immigration judge or any other authority under the Immigration and Nationality Act ("INA") on the question of the defendant's removability from the United States. The defendant further understands the rights the defendant would possess in a contested administrative proceeding and waives these rights, including the defendant's right to examine the evidence against him, to present evidence on his behalf, and to cross-examine the witnesses presented by the government.

The defendant agrees to waive his rights to any and all forms of relief or protection from removal, deportation, or exclusion under the INA, as amended, and related federal regulations. These rights include, but are not limited to, the ability to apply for the following forms of relief or protection from removal: asylum; withholding of removal under Title 8, United States Code, Section 1231(b)(3); any protection from removal pursuant to Article 3 of the United Nations Convention Against Torture, including withholding or deferral of removal under 8 C.F.R. § 208; cancellation of removal; adjustment of status; registry; de novo review of a denial or revocation of temporary protected status (current or future); waivers under Title 8, United States Code, Sections 1182(h) or 1182(i); visa petitions; consular processing; voluntary departure or any other possible relief or

protection from removal available under the Constitution, laws, or treaty obligations of the United States. As part of this agreement, the defendant specifically acknowledges and states that the defendant has not been persecuted in, and has no present fear of persecution in, India on account of his race, religion, nationality, membership in a particular social group, or political opinion. Similarly, the defendant further acknowledges and states that the defendant has not been tortured in and has no present fear of state-sponsored torture in India that would presently give rise to an asylum claim.

The defendant hereby requests that an order be issued by this Court for his removal to India. The defendant agrees to accept a written order of removal as a final disposition of any immigration proceedings and waives any and all rights to challenge any provision of this agreement in any United States or foreign court or tribunal.

The defendant hereby agrees to make the judicial order of removal a public document, waiving his privacy rights, including his privacy rights under 8 C.F.R. § 208.6. At the request of the U.S. Attorney's Office, U.S. Immigration and Customs Enforcement ("ICE") concurs with the government's request for a judicial order of removal. As a result of the above-referenced order, upon the completion of the defendant's criminal proceedings, including any sentence of incarceration, the defendant shall be removed to India.

### E.    Assistance in the Execution of Removal

The defendant agrees to assist ICE in the execution of his removal. Specifically, the defendant agrees to assist ICE in the procurement of any travel or other documents necessary for the defendant's removal; to meet with and to cooperate with

representatives of the country or countries to which the defendant's removal is directed; and, to execute those forms, applications, or waivers needed to execute or expedite the defendant's removal.  The defendant further understands that his failure or refusal to assist ICE in the execution of his removal shall breach this plea agreement and may subject the defendant to criminal penalties under Title 8, United States Code, Section 1253.

### F.     Re-entry and Penalties

The defendant concedes that the entry of this judicial order of removal renders him permanently inadmissible to the United States as those terms are defined in the INA. He agrees that he will not enter, attempt to enter, or transit through the United States without first seeking and obtaining permission to do so from the Secretary of the Department of Homeland Security or other designated representative of the U.S. government.

### G.     Forfeiture of Assets:

The defendant admits the forfeiture allegations. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to Title 18, United States Code, Section 982(a)(1) whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere.  The assets to be forfeited specifically include but are not limited to: a money judgment in the amount of the proceeds obtained by the conspiracy.  The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action.  The defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters. Having

been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives his rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to him if notice is not sent within the prescribed time frames. The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

The United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from the sale of the judicially forfeited assets be remitted or restored to eligible victims of the offense[s], for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws, if the legal requirements for recommendation are met. The defendant understands that the United States Attorney's Office only has authority to recommend such relief and that the final decision of whether to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law.

## II. ELEMENTS OF THE OFFENSE

The parties agree that the elements of Count 1, a violation of Title 18, United States Code, Section 1956(h), Money Laundering Conspiracy, are as follows:

- *First:* the defendant agreed with at least one other person to commit money laundering in violation of 18 U.S.C. Section 1956(a)(1)(B)(i) (Concealment);

- *Second:* the defendant knew the essential objective of the conspiracy.

- *Third*: the defendant knowingly and voluntarily participated in the conspiracy.

- *Fourth*: there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

*Tenth Circuit Pattern Jury Instructions for Conspiracy*, § 2.19 (2021) (modified) (no 10th Circuit Pattern); *see* 18 U.S.C. § 1956(h); *United States v. Keck,* 643 F.3d 789, 794 (10th Cir. 2011); *United States v. Fishman*, 645 F.3d 1175, 1187 (10th Cir. 2011); *Whitfield v. United States,* 543 U.S. 209, 215-216 (2005) (there is no overt act requirement for a 1956(h) conspiracy).

The parties agree that the elements of the object of the conspiracy, Money Laundering (Concealing Illegal Proceeds), a violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), are as follows:

- *First*: the defendant conducted a financial transaction;

- *Second*: the transaction involved the proceeds of mail fraud;

- *Third*: the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and

- *Fourth*: the defendant conducted the financial transaction knowing it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity.

*See* 10th Cir. Crim. J.I. § 2.73.1, *United States v. Gonzalez,* 918 F.3d 808, 812 (10th Cir. 2019).

## III.    STATUTORY MAXIMUM SENTENCE

The maximum sentence for a violation of Count 1 of the Superseding Indictment is: not more than 20 years' imprisonment; not more than three years of supervised release; maximum fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or both fine and imprisonment; $100 mandatory victim's fund assessment fee; and restitution.

## IV.    COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury. Because the defendant is an alien, the conviction may cause the defendant to be deported and removed from the United States or confined indefinitely if there is no country to which the defendant may be deported, denied future admission into the United States, and/or to be denied citizenship.

## V.    STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those

considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree that there is a factual basis for the guilty plea the defendant will tender pursuant to this agreement. The parties further agree that the date on which relevant conduct began is January 2020. The factual basis is set forth below.

This conspiracy involved laundering the proceeds from a government official imposter scheme. The scheme operated as follows:

Victims were contacted by phone and coerced into believing that they were under investigation by "Agents" of the FBI, SSA, DHS, Treasury, or U.S. Drug Enforcement Administration (DEA). Often the victims were told that their arrest and/or deportation from the United States had been ordered by law enforcement and was imminent, and the only way to avoid arrest was to pay the "Government" large sums of money as instructed.

In a typical scenario, the "Agent" informed a victim that their identity had been connected to a criminal incident and instructed the victim to remain on the phone for the duration of the call while the victim traveled to their bank to withdraw cash (U.S. Currency), financial transactions for purposes of 18 U.S.C. § 1956(c)(4)(A)(i). The "Agent" then convinced the victim to package the cash in a specific manner and ship the cash to an alleged government official via Federal Express (FedEx) or United Parcel

Service (UPS), both interstate commercial carriers.   The victims were told their money would remain in "trust" until the matter could be sorted out.  The victims reported that they believed they were speaking to legitimate U.S. Government officials and that paying the fees would alleviate their alleged criminal liability.

To date, the investigation has identified a number of individuals nationwide, referred to as "runners," whose role in the scheme was to receive the cash sent from the defrauded victims. Three runners were charged in this prosecution: the defendant, Dhruv Jani ("Jani"), an Indian national, James Albert Witte ("Witte"), a U.S. Citizen, and Jason Lee Henderson ("Henderson"), a U.S. Citizen.  At the time of the events described below, all three defendants were residing in Wray, Colorado.

The identities of the individuals who made these calls to the victims is unknown to the government.  Mr. Jani maintains that he did not make any of these calls and the government's evidence shows that they originated from India.  The government submits that evidence recovered from Mr. Jani's laptop, combined with what it asserts is the leadership role the defendant assumed in this case and his contact with individuals from India during the scheme, all render him accountable for the underlying offense of mail fraud.  The defense disputes that contention. _Says Dhruvjani_

In this case, the ~government asserts that the~ defendant coordinated the receipt and pickup of packages and operated in a management role overseeing Witte and later, Henderson, who both used various fraudulent identity documents to pick up the packages.  The defendant was involved in securing these fraudulent identity documents for Witte and Henderson. The government believes that it has identified fifty-seven victims of this scheme who mailed packages to Colorado.  These victims provided the names of the "government agents" to whom they were directed to mail packages of cash and the manner of shipping

(FedEx or UPS). Shipment records reflect in almost all incidents the packages were delivered to Walgreens stores in Northern Colorado (Sterling, Wray, Greeley, Loveland, Fort Collins, Fort Morgan, and a few in Denver). Video surveillance from these stores and text messages from Witte's and Henderson's phones tied them to specific fake identification cards used to pick up the packages.

Many of these same victims were also directed to mail packages to other states. Some report being directed by the same government official imposters to purchase gift cards from various retailers/stores and were told to read the card numbers and security codes over the phone to the fraudsters. The government has identified approximately $1 million in gift cards purchased by victims identified in this case. The gift card aspect of the scheme was not alleged in the Superseding Indictment but, should the Court ultimately find him responsible for the entirety of the scheme, the defendant has agreed, pursuant to Title 18, United States Code, Section 3663(a)(3), to pay restitution to these victims for the gift cards purchased and mailed, in an amount to be determined prior to sentencing.

The identities of the defendant, Witte, and Henderson were discovered as follows: On November 4, 2020, a package shipped via UPS to an individual in Sterling named "Joe Airem" was interdicted at the local UPS shipping hub. The package, which contained U.S. Currency, was sent to "Airem" by a victim of the government impersonation scam from University Place, Washington with the initials D.A.

When "Joe Airem" attempted to retrieve the package from a UPS store in Sterling, Colorado, the clerk became suspicious of "Airem" and refused to relinquish the package. When "Airem" exited the store, the clerk contacted the Sterling Police Department who initiated a traffic stop of a vehicle driven by Witte.

During the stop, Witte allowed law enforcement to view his phone which revealed communications between he and an individual named 'Kal Jani' for whom Witte claimed to be picking up the package.

Law enforcement subsequently identified 'Kal Jani' as the defendant Dhruv Jani ("Jani"), at that time a B1/B2 Non-Immigrant Visa holder from India.

Witte subsequently waived his Miranda rights and consented to an interview with law enforcement at the Sterling Police Department.  During Witte's interview, he admitted to the following:

Witte stated that the defendant worked at a 7/11 store in Wray, Colorado and that Witte had known the defendant for years.  Witte stated he entered into a business agreement with the defendant in 2020 after closing his restaurant in Wray.  The defendant directed Witte to send the defendant a picture of Witte to have false IDs made.  When Witte asked why he needed a false ID, the defendant stated it was too dangerous to use Witte's real ID.  The defendant later provided Witte with the fake IDs and then directed Witte to pick up packages containing U.S. Currency from UPS and FedEx locations (typically inside Walgreen's stores) using the fake IDs.  Witte and the defendant would travel to the Walgreen's stores and the defendant would stay in the car while Witte would pick up the packages of cash.

Witte claimed that he was paid $200 from each package he picked up and turned the rest over to the defendant.  At the time of his arrest, Witte claimed not to know what the defendant did with the money that Witte gave him.

Witte confirmed his use of several fake IDs to pick up packages to include the names "Jacob Hicks," "Andrew Pwesei," and "Joe Airem," and that the defendant directed him to return the IDs after they had been used several times.  Witte stated he

was not involved in picking up packages from the end of August 2020 through the end of September 2020. The government agrees the evidence supports this assertion.

Witte subsequently reported to law enforcement that when he asked the defendant where the money in the packages came from, the defendant responded, "You don't want to know."

Witte reported that the defendant told him that they could not deposit cash from the packages into the bank accounts of third parties, so it was necessary to purchase money orders and deposit those into the accounts of others, therefore comprising financial transactions for purposes of 18 U.S.C. § 1956(c)(4)(A)(i). Both the defendant and Witte purchased money orders. Witte admitted that he and the defendant purchased money orders using their true names and fake IDs at 7/11s and at various other stores. The defendant instructed Witte on the number and denomination of money orders to purchase. After purchasing the money orders, the defendant and Witte would return to their car and the defendant would place the money orders in a zippered bank bag and stockpile them at home until the defendant received instructions about where to deposit them. The defendant filled out and signed the majority of the deposit slips for the money orders and made the deposits himself.

During subsequent meetings with the government, Witte provided the following additional information:

Witte stated the defendant knew how much money to expect in each package. Typically, if the package contained less than $10,000, they would open and count those packages in a parking lot with Witte filming, using the defendant's phone, the defendant counting the money. The defendant would then send the "count video" to a man known

to Witte as Mike in India. Witte recalled that on approximately ten occasions, the defendant opened a package that contained more than $10,000 and counted it by hand in front of Witte in the car. Witte understood that for all other packages over $10,000, the defendant took those packages to Witte's home that the two shared and the defendant would use a money counter he purchased through Amazon to count the money. Witte saw the defendant do this on one occasion right after the defendant got the money counter. Witte stated the defendant used the money counter to count and bundle money the defendant had stockpiled in the basement and stored in small safes. Witte also was present when the defendant used the money counter to count the $230,000 mailed by Victim D.Z. as alleged in Count 3 of the Superseding Indictment. Witte used his own phone to record the counting of the $230,000 as the defendant was on his phone communicating with someone from India during this count. Law enforcement recovered this video upon a search of Witte's phone.

Witte recounted that he performed these same functions – picking up packages of cash with false IDs and purchasing money orders with the cash – with another man from India, a friend of the defendant's, with the first name of Deepak. The defendant was never with Witte when he picked up packages for Deepak. Witte estimated that he picked up approximately ten packages with Deepak. Witte stated that Deepak and the defendant were friends from India and were on opposite rotations for returning to India due to visa restrictions. Deepak lived with Witte when the defendant was back in India.

Witte also stated that during the scheme, an Indian man from California showed up at Witte's home in Wray, Colorado, to meet with the defendant. This Indian man was travelling with another man who stayed in the car. Mr. Witte claims, but Mr. Jani denies,

that that morning, the defendant told Witte people were coming to pick up $1 million in cash. Witte claims he saw the defendant bring lockboxes containing stockpiled cash up from the basement. Once the visitor arrived, Witte felt that he, Witte, was making the man uncomfortable so Witte went to his bedroom. There, he was able to see through blinds on his bedroom door the defendant and the Indian man located in a screened-in porch. Witte watched the defendant and the Indian man count bundles of money from the open lockboxes and put the bundles of money into the Indian man's backpack. Witte saw ten stacks of bundled money which would equate to $1 million. Mr. Jani specifically denies this. Later, Witte asked the defendant where all that money came from and whether that money was the money Witte and the defendant had picked up together. The defendant told Witte, "it [the cash] was dropped off here at the house and you don't want to know." Later, the defendant told Witte that same man had come back to pick up more money from Witte's home. Mr. Jani disputes the truth of Mr. Witte's statements.

Witte reported that in early August 2020, he traveled with the defendant to California so that the defendant could deliver $1 million in cash to a jewelry store in Los Angeles. Witte stated that the defendant told him they were delivering $1 million either before they left Wray or while en route to California. Mr. Jani denies that he told Mr. Witte this and denies transporting $1 million dollars.

Witte and the defendant were scheduled to return to Colorado the next day after delivering what Mr. Witte claims (and Mr. Jani denies) was $1 million, but instead, the defendant told Witte they couldn't leave. The defendant stated he had received a cash delivery at the hotel the night before and they needed to transport that cash to the jewelry store. The defendant did not tell Witte how much money had been delivered,

just that it was "a lot of money." The defendant had the money in his backpack and Witte did not see it.

Co-defendant Jason Lee Henderson worked with the defendant in this scheme in the same way as Witte. Henderson was known to the Sterling PD as he had had previous run ins with the law in the Wray area. Video surveillance from a Walgreen's on the day a victim's package arrived showed Henderson using a fake ID to pick up the package. Sterling PD then obtained a state search warrant for Henderson's phone which included copies of his text messages.

These text messages revealed that the defendant and Henderson were regularly communicating with one another to receive packages. The defendant regularly text messaged Henderson to let him know about pending package pickups and to arrange to pick up Henderson to go to work. The defendant would regularly pick up Henderson at the park in Wray, Colorado, as Henderson did not have a driver's license.

Law enforcement interviewed Henderson's ex-girlfriend, who resided in Yuma, Colorado. The ex-girlfriend informed law enforcement that Henderson was living with her in September 2020 and that a "foreigner" would come to pick him up occasionally in a dark colored car. The ex-girlfriend informed law enforcement that Henderson would go to work with the man and would typically come home with upwards of $1,000 cash at the end of the workday. Henderson had told the ex-girlfriend that he was doing something computer-security related.

Western Union and Money Gram records reveal that close in time to the packages of cash being delivered, Witte and Henderson purchased money orders and deposited them into the accounts of third parties.

After Henderson was arrested in this case, he waived his Miranda rights and consented to an interview with federal law enforcement agents. During Henderson's interview, he admitted to the following:

Henderson stated that he met the defendant in 2017 or 2018 when the defendant was working at the 7/11 store in Wray, Colorado. Henderson worked for Witte at Witte's restaurant in Wray until it closed in January or February of 2020. In March of 2020, the defendant approached Henderson about a way to reopen Witte's restaurant by collecting money from investors in India. The defendant told Henderson that the defendant and Witte were receiving FedEx and UPS packages containing money delivered to Witte's home, where the defendant also lived. The defendant told Henderson packages could come to Henderson's residence under different names. Henderson and the defendant texted about a package addressed to "Nick Burns" being mailed to Henderson's residence in March of 2020. The government's evidence reveals that Victim R.P was convinced by the scammers in this scheme to mail $8,000 to "Nick Burns" at Henderson's residence on March 4, 2020, but this package was ultimately not delivered. Nonetheless, the parties agree this attempted mailing of $8,000 is appropriately included in the intended loss amount for purposes of the guideline calculation.

Henderson was living with his girlfriend at this time and his girlfriend advised Henderson not to get involved with the defendant. The girlfriend was subsequently questioned by a Wray Police Officer about the "Nick Burns" package being sent to the residence Henderson and his girlfriend shared. After this, Henderson texted the defendant about this exchange with the officer, advised the defendant that the FBI was involved, and stated, "you can count me out. I'm [not] trying to end up in prison."

By July 2020, when the defendant had not gotten in trouble over the "Nick Burns" package, Henderson decided that what the defendant was proposing must not be illegal. Henderson needed money and so he decided to help the defendant. Henderson agreed to purchase money orders using his own name and identification card and deposit these money orders into the bank accounts of others. The defendant always had cash on hand for purchase of the money orders and Henderson observed the defendant fill out the deposit slips.

The first time the defendant gave Henderson a fake ID card was when the defendant asked Henderson to go into a Walgreen's in Fort Morgan to pick up a package in August 2020. Henderson asked the defendant why he, Henderson, needed a fake ID to pick up the package. The defendant explained the large amounts of money they were depositing could not be done in the defendant or Henderson's names because of restrictions and therefore, they needed different fake IDs to conduct their business.

Henderson remembered using fake IDs in the names of "John Robinson," and "Mark Payton," and stated he would not be surprised if there were other fake IDs he used because the defendant told Henderson that he, the defendant, had ten fake IDs made with Henderson's photo. Henderson admitted that he knew using a fake ID was illegal.

Henderson used some of the fake IDs to purchase money orders and to pick up packages. When purchasing money orders, Henderson would go inside the store alone. The defendant would instruct Henderson as to the number of money orders to purchase and their denominations. If they needed to purchase money orders more than $3,000, they would go to Walmart. Henderson would make up social security numbers

and the defendant would coach Henderson on how to answer questions regarding his employment and the reason for the money order.  Henderson never saw the defendant purchase money orders.

During the time of the conspiracy, the defendant would drive Henderson to the stores for the package pickups and would wait inside while Henderson picked up the packages.  The defendant also drove Henderson to stores to purchase the money orders and to the banks for the deposits, financial transactions for purposes of 18 U.S.C. § 1956(c)(4)(A)(i).

After Henderson picked up the packages of cash, he and the defendant would typically drive to a parking lot to count the money.  Henderson would hold the defendant's phone and record the defendant showing all sides of the package to include the shipping label, opening the package, counting the money, and saying the total amount into the video.  The defendant explained they needed to video the count so the "investors" knew the defendant received all the money.  The packages contained anywhere from $2,000 to $40,000.  Henderson also recalled a few instances when the defendant would check into a hotel room, go to the room by himself, count the money, and then return to the car approximately 25 minutes later where Henderson was waiting.

In the beginning, Henderson was paid $100 per day to make deposits.  Once he started using fake IDs to pick up packages of cash, he and the defendant split ten percent of the total amount of the cash 50/50.

Throughout the time Henderson worked with the defendant, the defendant told Henderson to delete their text messages.  Henderson did not delete these text

messages until September of 2021, after (unbeknownst to Henderson) these messages had already been retrieved by law enforcement. The defendant also told Henderson not to talk about what they did if approached by law enforcement. Henderson knew Witte was doing the same thing Henderson was doing for the defendant, but Henderson did not interact with Witte during the conspiracy.

In a subsequent interview with the government, Henderson stated that between the use of his second and third fake IDs, he saw the defendant talking to a man via a live video from India.

After Henderson was released from the hospital in September 2021, the defendant messaged Henderson about getting funds off gift cards. The defendant told Henderson he, Henderson, would receive identity information that matched the gift cards he was supposed to liquidate. Henderson declined to do so and deleted these messages.

The scope of the conspiracy charged in the Superseding Indictment was to use fake IDs to pick up packages of cash, purchase money orders, and deposit those money orders into third-party accounts. The government asserts that Witte and Henderson operated at the direction of the defendant but independently of each other and at different periods of time.

The 57 victims mailed, or attempted to mail,[2] approximately $1.6 million to the defendants in Colorado.[3]  Many of these same victims were also directed to mail packages of cash and gift cards to individuals in other states.  All told, the government submits, the victims who sent money and gift cards to Colorado and to other states are out approximately $7.2 million from the government official imposter scheme.  The defendant maintains that he is responsible for no more than $1.6 million of loss and reserves the right to contest this amount at sentencing.

## VI.    ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines.

The parties disagree about the guideline computation in this case.  Their respective calculations are set forth below.

---

[2] The attempted deliveries are comprised of deliveries not completed due to 1) the sender requested the package be returned prior to it being picked up; 2) law enforcement intercepted the package; 3) the package was redirected by the scammer(s) from Colorado to another state; or 4) significant steps were taken to send the package as directed but the package was ultimately not sent. The amount of money in attempted deliveries in this case is approximately $410,000.

[3] These victims are also out shipping expenses for the mailing of these packages to Colorado and other states, which amount will be included in the loss and restitution calculations.

Although the government is obligated to make a sentencing recommendation of 121 months, the parties understand that the parties have an independent obligation to assist the Court in making an accurate determination of the correct guideline range.  To that end, the parties may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

**Government's Calculation**

a)  The government submits that the applicable guideline is §2S1.1(a)(1) and accordingly, the base offense level is the offense level for the underlying offense from which the laundered funds were derived, because "(A) the defendant . . . would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct); and (B) the offense level for that offense can be determined."

b)  The underlying offense in this case is mail fraud.  Pursuant to §2B1.1, the base offense level is **7** plus an **18**-level increase based on more than $3.5 million but less than $9.5 million for the approximately **$7.2 million** in losses suffered by the 57 victims identified in this scheme.  The adjusted offense level is therefore **25.**

c)  Pursuant to §2B1.1(b)(2)(B), an increase of **4** levels is warranted because the offense resulted in substantial financial hardship to five or more victims;

d)  Pursuant to §2B1.1(b)(10)(B), an increase of **2** levels is warranted because a substantial part of the fraud scheme was committed from outside the United States.

e)  Pursuant to §2S1.1(b)(2)(B), an increase of **2**  levels is warranted because the defendant was convicted under 18 U.S.C. § 1956.

f)  Pursuant to §2S1.1(b)(3), an increase of **2** levels is warranted because the offense involved sophisticated laundering, *i.e.,* it involved two or more levels (layering) of transactions;

g)      Pursuant to § 3B1.1(c), an increase of **2** levels applies because the defendant was an organizer, leader, manager, or supervisor in the scheme.

h)      Pursuant to § 3C1.1, an increase of **2** levels applies because the defendant willfully attempted to obstruct or impede the administrative of justice with respect to the investigation of this offense by directing Witte and Henderson to delete the text messages in which they discuss the scheme with the defendant and by the defendant directing Henderson not to talk to law enforcement about the scheme.

i)      The adjusted offense level is therefore **39**.

j)      The defendant should be afforded a **3**-level reduction for acceptance of responsibility. The resulting total offense level is **36**.[4]

k)      The parties understand that the defendant's criminal history computation is tentative and based on the defendant's prior convictions.  The parties believe the defendant is in criminal history category is I.

l)      The career offender/criminal livelihood/armed career criminal adjustments do not apply.

m)      The advisory guideline range resulting from these calculations is **188-253** months.  However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level(s) estimated above could conceivably result in a range from **188** months (bottom of Category I) to **405** (top of Category VI). The guideline range would not exceed, in any case, the statutory maximum applicable to the count of conviction.  In this case, that amount is **240** months.

n)      Pursuant to guideline § 5E1.2, assuming the estimated offense level above is correct, the fine range for this offense would be

---

[4] Because the defendant's sentence, the government submits, is calculated pursuant to §2S1.1(a)(1), as a direct money launderer responsible for the underlying offense, the enhancements as set forth in §2B1.1 apply to this calculation (unlike Witte and Henderson).  However, after applying those enhancements, government counsel should have gone back to the specific offense characteristics set forth in §2S1.1(b). Government counsel failed to do so, which is why the offer in this case was to a sentencing recommendation of 121 months, the bottom of an adjusted offense level of 32.  Government counsel honored this sentencing recommendation for a limited amount of time after discovering this error, and after new defense counsel entered her appearance.

$40,000 to $400,000, plus applicable interest and penalties.

o)   Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is not more than 3 years.

p)   The defendant agrees to pay restitution to the victims of this offense, less any restitution ordered for these victims in other jurisdictions, with the exact amount to be determined prior to sentencing.

**Defendant's Calculation**

a)   The defendant submits that the applicable guideline is §2S1.1(a)(2) and accordingly, the base offense level is **8** plus the offense level corresponding to the value of the laundered funds. The defendant submits that amount is between $1.5 and $3.5 million for an additional **16** levels.

b)   The adjusted offense level is therefore **24.**

c)   Pursuant to §2S1.1(b)(2)(B), an increase of **4** levels is warranted because the defendant was in the business of laundering funds.

d)   The defendant reserves the right to object to a **2** level enhancement pursuant to § 3B1.1(c), for organizer, leader, manager, or supervisor in the scheme.

e)   The defendant reserves the right to object to a **2** level enhancement pursuant to § 3C1.1, for willfully attempting to obstruct or impede the administrative of justice.

f)   Assuming neither enhancement applies, with acceptance of responsibility, the resulting offense level is **25**

g)   The advisory guideline range for an offense level of **25** and criminal history category of **I** is **57-71** months.

h)   Pursuant to guideline § 5E1.2, assuming an estimated offense level of **25**, the fine range for this offense would be $20,000 to $200,000, plus applicable interest and penalties.

i)   Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is not more than 3 years.

j)   The defendant agrees to pay restitution to the victims of this offense in an approximate amount of **$1.6 million** (less any restitution ordered for these victims in other jurisdictions), with the

exact amount to be determined prior to sentencing.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.   ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

Date: 4/7/23

Dhruv Jani
Defendant

Date: 4/7/23

Stephanie M. Snyder
Assistant Federal Public Defender

Date: 4/18/23

Martha A. Paluch
Assistant U.S. Attorney